UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD CLAYTON, *Administrator Ad Prosequendum for the Estate of* ANDREW JAMES DIXON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEWARK, MAYOR RAS J. BARAKA, OFFICER JOVANNY CRESPO, in his official and individual and capacities; OFFICER HECTOR ORTIZ, in his official and individual and capacities; OFFICER VALERIA SANCHEZ, in her official and individual capacities; OFFICER GABRIEL LOPEZ, in his official and individual and capacities; OFFICER EDGARDO GONZALEZ, in his official and individual and capacities; LIEUTENANT KIRT RUBEL, in his official and individual and capacities; JOHN DOE POLICE OFFICERS 1-20, AAHMAD GRIFFIN, Administrator Ad Prosequendum and Administrator of the ESTATE OF GREGORY GRIFFIN, and EBONY DAVIS,<br><br>Defendants. | Civ. No. 21-1289 (KM) (ESK)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

In January 2019, Andrew Dixon was the passenger in a vehicle driven by Gregory Griffin that was involved in a car chase with the Newark Police Department ("NPD"). After the chase ended, defendant Officer Jovanny Crespo shot both Griffin and Dixon, killing Griffin and injuring Dixon. Ronald Clayton,

the administrator of Dixon's estate,[1] now brings numerous tort and civil rights claims against the police officers involved in the chase and shooting, as well as Mayor Ras J. Baraka and the City of Newark itself.

The Mayor and the City (collectively the "City defendants") now move jointly to dismiss the *Monell* claims contained in Counts III, IV, and IX. For the following reasons, their motion to dismiss is **GRANTED in part and DENIED in part**. All claims against Mayor Ras J. Baraka in his personal capacity are dismissed. The *Monell* claims are in many respects worthy of development in discovery and will go forward. I have, however, pruned back the complaint by dismissing as facially deficient certain *Monell* sub-theories: the *Monell* policy claim (but not the custom claim) of Count III, the failure to train and related claims (but not the failure to discipline claim with respect to defendant Crespo) in Count IV; and the negligent hiring claim of Count IX.

The City defendants also move for this case to be stayed pending the resolution of Officer Crespo's criminal trial. I decline to grant an outright stay and instead will let discovery move forward on issues not directly related to Crespo's defense of the criminal charges against him.

## I. BACKGROUND

On January 28, 2019, Andrew Dixon was the passenger in a car driven by Gregory Griffin. (Compl. ¶ 26.)[2] Newark police officer Valeria Sanchez pulled the car over. After approaching the car and demanding that Griffin turn off the engine, she saw a gun in the car. (*Id.* ¶¶ 25–56.) Because Griffin did not comply with her orders to open the car window and turn off the ignition, Sanchez

---

[1]   Dixon was killed earlier this year in an unrelated hit-and-run accident. (2AC ¶ 8.)

[2]   Certain citations to the record are abbreviated as follows:

DE = docket entry number in this case

2AC = Second Amended Complaint (DE 44)

Mot. = City Defendants' motion to dismiss (DE 26)

Opp. = Plaintiff's brief in opposition to the motion to dismiss (DE 37)

attempted to open the car door, at which point Griffin drove away. (*Id.* ¶¶ 73–74.) A car chase ensued, involving a number of officers, including Jovanny Crespo. (*Id.* ¶¶ 84–89.) Twice before the fatal encounter, Crespo got out of his police car and fired shots at the moving vehicle that contained Griffin and Dixon. (*Id.* ¶¶ 93–110.) Soon, another police vehicle forced Griffin and Dixon's car to a stop. Crespo then again got out of his police vehicle and approached the passenger side of the car on foot. (*Id.* ¶¶ 111–17.) He fired three shots into the vehicle, killing Griffin and nonfatally shooting Dixon in the face. (*Id.* ¶¶ 117–19.) Crespo and other officers then removed Dixon from the vehicle and handcuffed him. One officer put a knee on Dixon's neck while another punched him in the face. (*Id.* ¶¶ 122–126.)

In May 2019, a grand jury indicted Crespo on charges of aggravated manslaughter, aggravated assault, possession of a weapon for an unlawful purpose, and official misconduct for the shooting. (*Id.* ¶ 5.) A motion to dismiss in that case has been denied (Mot. at 37), but the case has not otherwise proceeded. No other officers involved in the incident were charged criminally.

Dixon's estate brings three counts against the City defendants (in addition to a number of claims against the individual officers which are not at issue on this motion). The Counts against the City defendants are *Monell* municipal liability claims under 42 U.S.C. § 1983 for maintaining a custom or policy resulting in a constitutional deprivation (Count III; 2AC ¶¶ 203–19); failure to train, supervise, and discipline (Count IV; 2AC ¶¶ 220–30); and negligent hiring and retention of employees (Count IX; 2AC ¶¶ 262–67).[3] *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (stating standards for municipal government § 1983 liability; *see infra*).

In 2011, the United States Department of Justice began an investigation into civil rights and Constitutional violations by the Newark Police Department. (2AC ¶ 132.) That investigation resulted in a 2014 report ("DOJ Report") that detailed certain patterns of misconduct within the department. (*Id.* ¶ 139; DE

---

[3]    I construe Count IX as a *Monell* claim, not a state-law tort claim. (Opp. at 22.)

26-10, Ex. 4). In 2016, the City entered into a Consent Decree with the DOJ, which required the police department to make a number of policy reforms and appointed a federal monitor to oversee the department. (DE 26-7, Ex. 1.)

At the time of the 2019 incident detailed in the complaint, the NPD had both a vehicular pursuit policy, revised in 2017 (2AC ¶ 162; DE 26-12, Ex. 6), and use of force policy, revised in November 2018 (2AC ¶¶ 284–85; DE 26-13, Ex. 7; *see* https://www.newarkpdmonitor.com (official website of NPD Independent Monitor, last visited Dec. 21, 2021).)

Plaintiff filed this case on January 27, 2021, and amended the complaint the next day. (DE 1, 3.) On April 16, 2021, the City defendants moved to dismiss. (DE 26.) Plaintiff filed a brief in opposition (DE 37) and the City defendants filed a reply (DE 42.) On June 8, 2021, Judge Edward Kiel granted a stay of discovery and denied plaintiff's motion to consolidate this case with the civil case filed by Griffin.[4] (DE 38) Plaintiff filed a second amended complaint on July 6, 2021. (DE 44) Because the second amended complaint did not substantially alter its predecessor, Judge Kiel ordered that the existing motion to dismiss be considered in relation to the second amended complaint (DE 43.) The motion to dismiss is now fully briefed and ripe for decision.

## II.   MOTION TO DISMISS COUNTS III, IV, AND IX

### A. Standard of Review

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations, but it must assert "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[4]   A parallel state-court civil action, brought on behalf of Gregory Griffin, the deceased driver of the car, was removed to this federal court but recently remanded to state court because the complaint asserted only state-law claims. *Estate of Griffin v. City of Newark*, Civ. No. 20-17290, DE 15 (Hayden, J.).

678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

On a motion to dismiss, courts may consider matters within the "four corners" of the complaint, as well as "documents incorporated into the complaint by reference," *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009), and documents that are "integral to or explicitly relied upon" in the complaint, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In addition, courts may take judicial notice of the contents of public records in ruling on a 12(b)(6) motion. *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007).

Here, plaintiff argues that I should not consider the eight documents that the City defendants have attached to their motion to dismiss. (Opp. at 18.) In ruling on this motion to dismiss, only four of the attached documents are relevant: the NPD pursuit policy, the NPD use of force policy, the DOJ Report, and the consent decree between Newark and the Department of Justice. (DE 26-12, Ex. 6; DE 26-13, Ex. 7; DE 26-10, Ex. 4; DE 26-7, Ex. 1.) The written policies are repeatedly referred to and relied on in the complaint, especially Count III, which alleges that the policies of the NPD resulted in the alleged violation of Mr. Dixon's constitutional rights. (2AC ¶ 203–19.) Because they are public records and because the content of the policies is integral to the complaint, these two policy documents are appropriate for me to consider. The DOJ investigation, Report, and resulting consent decree are also discussed at length in the complaint and are thus integral to it. (2AC ¶ 131–39, 224–25). Indeed, the Third Circuit has upheld a district court's reliance on the Newark-DOJ consent decree at the motion to dismiss stage, in connection with a *Monell* claim against the City. *Est. of Roman v. City of Newark*, 914 F.3d 789, 797 (3d

Cir.), *cert. denied*, 140 S. Ct. 82, 97 (2019). I therefore may consider those four documents in my analysis of the motion to dismiss.[5]

### B. *Monell* Theories of Municipal Liability

In *Monell v. Dep't of Soc. Servs.,* the Supreme Court established that local government units cannot be held liable via respondeat superior for the constitutional violations of their employees "unless action pursuant to official municipal policy of some nature caused a constitutional tort" to be committed by such employees. 436 U.S. at 691. "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (cleaned up). Policies need not be official, however. Plaintiffs can hold municipalities liable by proving that a customary practice "although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Whether the plaintiff pursues a policy or custom claim, he or she must allege that "a [city] government's policy or custom ... inflict[ed] the injury" in question. *Monell*, 436 U.S. at 694. In other words, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850; *see also Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).

The Third Circuit has held that a *Monell* claim may also be premised on a municipality's failure to train, supervise, and discipline its employees. To plead such a claim, a plaintiff "must demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'" *Roman*, 914 F.3d at 798, 800 (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)). Deliberate indifference is plausibly pled by showing that "(1) municipal

---

[5] To be clear, I do not rely on these documents as evidence, as I would on a summary judgment motion. Rather, they are cited for their existence and legal effect, and also insofar as they may lend plausibility to the complaint's allegations for purposes of Rule 8.

6

policy makers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (quoting *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011) (internal brackets omitted)). In addition, plaintiffs must allege that there is a "direct causal link" between the policy and the constitutional violation that is alleged. *Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Conclusory recitations of the elements of a *Monell* claim are not sufficient. *See, e.g., Benjamin v. E. Orange Police Dep't*, 937 F. Supp. 2d 582, 595 (D.N.J. 2013) (dismissing the claim against the city because the plaintiff failed to plead adequate facts demonstrating the existence of a relevant policy or custom).

### C. Claims against Mayor Baraka in his Personal Capacity

Plaintiffs bring Counts III, IV, and IX against Mayor Ras J. Baraka in both his personal and official capacity. (2AC ¶ 204; Opp. at 20–21.) Officials can be held liable in their personal capacities if they either (1) participated directly in the constitutional violation, or, (2) "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Here, the plaintiff does not allege that Mayor Baraka had any personal involvement in the car chase and shooting. Rather, plaintiff argues that Mayor Baraka is liable because he was "specifically on notice that there was overwhelming evidence that misconduct by Newark Police Officers, and that a lack of supervision and training resulted in the violations of citizens' constitutional rights which were being ignored" (Opp. at 20), but "failed to take preventive and re[me]dial measures or to establish a system that was capable of disciplining or correcting the misconduct of its officers" (*id.* at 21).

The complaint, however, states only conclusory generalities about Mayor Baraka's role in establishing and maintaining the policies and practices of the NPD. For example, the complaint states that Baraka "had final policy making authority regarding establishing written policies and training programs governing the conduct of NPD officers" and that the "policies and training established or approved by the MAYOR constitute the official policy of the CITY OF NEWARK and were the moving force behind and caused MR. DIXON'S injuries." (2AC ¶ 204, 206.) Such conclusory claims are not enough. Plaintiff does not plead any specific facts related to Mayor Baraka's influence on the NPD's use of force or pursuit policies, or his involvement in police training or discipline.[6] In fact, the complaint does not allege a single act of any kind taken by Mayor Baraka. That a mayor has general authority over city governance is not sufficient to hold him personally liable for the actions of city employees. Because the plaintiff has not alleged any particular acts by Mayor Baraka regarding the NPD's policies, supervision, or training, the claims against the Mayor in his personal capacity must be dismissed.

### D. Discussion of *Monell* Claims Against the City and the Mayor in his Official Capacity

The remaining *Monell* defendants, then, are the City itself and the Mayor in his official capacity. A suit against an official in his or her official capacity is "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). For simplicity, I will discuss the *Monell* claims against the City, specifically mentioning Mayor Baraka in his official capacity only as necessary.

#### 1. *Monell* "policy" claim (Count III)

To properly state a *Monell* policy or custom claim against a municipality, a plaintiff "must identify a custom or policy, and specify what exactly that

---

[6]    Any straightforward attribution of relevant municipal policies to the Mayor is additionally complicated by the 2016 consent decree, which placed the NPD and revision of its policies under the authority of an independent monitor.

custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009). Plaintiff has failed to allege a specific policy of the city or NPD that caused Mr. Dixon's injury. In fact, the complaint alleges that Dixon was injured because Crespo and other officers *violated* the NPD's existing and written policies. (2AC ¶ 162, 184–87.) In addition, the NPD has since 2016 been under a federal monitor, who, as of November 2018, had promulgated new, stricter formal policies, particularly regarding arrests and use of force. *See* https://www.newarkpdmonitor.com/reportsresources/

Nothing in the complaint discusses any NPD policy with specificity or identifies any way that the existing policies led to constitutional violations. *A fortiori,* no defect is identified with respect to the formal policies that were in place. Because the complaint includes no pertinent facts related to the NPD's policies, it cannot allege that there was a "direct causal relationship" between the inadequacy of such policies and the alleged violation of Mr. Dixon's rights, *Brown v. Commonwealth*, 318 F.3d at 482.

The motion to dismiss Count III insofar as it asserts a *Monell* "policy" claim against the City defendants is therefore GRANTED.

### 2. *Monell* "custom" claim (Count III)

Even where appropriate official policies are in place, however, a municipality may be liable for fostering a *de facto* policy, *i.e.,* an established custom or practice of condoning Constitutional violations. Plaintiff cites several instances in which the City allegedly "promoted, fostered, or ratified several customs, patterns, or practices" that allegedly resulted in a violation of Mr. Dixon's constitutional rights. (2AC ¶ 209–212.)

Implicit in the briefing is a dispute over the level of generality at which an established custom or pattern should be defined. It is important that the custom encompass a category of activities that might reasonably be the subject of a discrete official policy, while not expanding to the point of meaninglessness. *See Terry v. Cty. of Milwaukee*, No. 17-CV-1112-JPS, 2018 WL 2567721, at *9 (E.D. Wis. June 4, 2018) ("Yet [plaintiff] cannot describe the

9

series of acts that she believes constitute the challenged practice except at the highest level of generality. If a practice is too expansively defined, as Terry's is, it becomes nonsensical to charge a municipal entity with notice of such a practice"); *Freeman v. City of Crown Point*, No. 2:13–CV–059 JD, 2014 WL 545511, at *10 (N.D. Ind. Feb. 11, 2014) (a plaintiff cannot tie together disparate instances of misconduct that "would encompass nearly every activity of the [police] department," as it "deprives the [municipality] of the notice to which it is entitled as to what policies it maintains that deprived [the plaintiff] of his rights").

Plaintiff would have me determine that a pattern of unconstitutional actions of any type by the NPD would suffice. The City defendants would define the custom or pattern in relation only to prior extended vehicle chases accompanied by shootings. I would narrow the Plaintiff's formulation and broaden the City's: The potentially relevant customs, I find, would be those governing use of excessive or deadly force in connection with apprehending a suspect.

I first consider vehicle pursuits. Pursuit and arrest of a suspect who is in a vehicle pose special challenges to law enforcement, both in terms of difficulty of apprehension and the need to make split-second decisions, especially because the car itself can become a deadly weapon. Municipalities, including Newark, commonly promulgate formal policies governing this specific area of police activity, laying down rules and providing training on how police engage in vehicle pursuits, conduct vehicle stops, and even respond to car crashes. Thus, a municipality may be liable for failure to train officers regarding high-speed chases, *see Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994), or for having car chase customs or policies that result in constitutional violations. Further, with respect to *Monell* policy, custom, or negligent training theories, the case law has given separate consideration to police shootings involving *moving* vehicles. *See McDonald v. City of Troy*, No. 1:18-CV-1327, 2021 WL 2232565, at *10 (N.D.N.Y. June 3, 2021); *Eberhardinger v. City of*

10

*York*, 341 F. Supp. 3d 420, 430 (M.D. Pa. 2018), *aff'd*, 782 F. App'x 180 (3d Cir. 2019); *Est. of Smith v. City of Wilmington*, No. 04-1254 GMS, 2007 WL 879717, at *14 (D. Del. Mar. 22, 2007), *aff'd*, 317 F. App'x 237 (3d Cir. 2009).[7]

It is true that the complaint alleges that Crespo repeatedly fired his weapon at the fleeing vehicle. But whether or not this was justified under existing policies (whether formal or *de facto*) governing vehicular pursuits, those shots do not seem to have resulted in any injury. The car pursuit, while relevant, is not at the core of plaintiff's constitutional claims here.

I therefore move on to consider the allegedly excessive use of force after the car had been stopped. Such a focus best accords with the allegations of the complaint. Plaintiff alleges that the officers twice used excessive force: first, when Crespo fired his weapon into the car, killing Griffin and injuring Dixon; and second, when the officers pulled Dixon from the car, and, after subduing and handcuffing him, continued to strike him. Those events, I find, are reasonably related to an ordinary claim of excessive force in connection with arrest. Established municipal custom in relation to excessive use of force, whether or not a vehicle was involved, would therefore be relevant, and would be an appropriate unit of analysis for a *Monell* "custom" claim.[8]

Plaintiff pleads two distinct sets of facts to support the custom claim: First, the complaint lists specific incidents of use of excessive force by the NPD;

---

[7] As to qualified immunity, the analysis has been parallel in many respects, with courts analyzing whether it was clearly established as an unreasonable use of force to shoot at the vehicle of a suspect attempting to evade arrest but who posed no immediate danger to officers. *See Jefferson v. Lias, No. 20-2526*, 2021 WL 5934677, at *5-*6 (3d Cir. Dec. 16, 2021) (discussing appropriate level of specificity for purposes of qualified immunity and following cases that deemed it an unreasonable use of deadly force to shoot at a fleeing vehicle) (citing, e.g., *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005); *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009); *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999); *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008)).

[8] At least provisionally, at the motion-to-dismiss stage; the Court's view of the relevant "pattern" could change in light of the facts as they develop. I do not mean, by the way, to cut off discovery or imply that the wild chase described in the complaint would not be relevant to the claims.

second it discusses the DOJ 2014 report and 2016 consent decree that placed the NPD under a federal monitorship. (2AC ¶ 131–148.)

The complaint lists seven specific instances of alleged application of excessive force by the NPD which took place between 2008 and 2021. Five of those took place in 2008 or 2009, a decade before the incident described in the complaint; the remaining two took place in 2020 and 2021, two years after the incident described in the complaint (although arguably close enough in time to be relevant). (2AC ¶ 140–48.) One of the incidents, in 2009, is most suggestive in that it involved the shooting of an unarmed motorist, and resulted in a jury finding that officers used excessive force.[9] (*Id.* ¶ 144.) A lawsuit resulting from a second 2009 incident was dismissed on procedural grounds. (*Id.* ¶ 145.) The two most recent cited incidents involve a May 2020 police beating after an "oral altercation" and a January 2021 shooting of an unarmed man. (*Id.* ¶ 142–43.)

The complaint also discusses the 2014 DOJ Report on the unconstitutional practices of the NPD and the related 2016 consent decree. (2AC ¶ 131–39.) In prior cases, the consent decree and its background have supported the denial of motions to dismiss *Monell* claims regarding police misconduct. (Opp. at 24 (citing *Fallen v. City of Newark*, 2017 WL 368500 (D.N.J. Jan. 24, 2017) and *Kelly v. City of Newark*, 2018 WL 1378727 (D.N.J. Mar. 16, 2018)). Plaintiff claims that the DOJ Report shows "a long-standing history of constitutional violations by the Newark Police Department that includes the type of behavior that resulted in the alleged deprivation of Mr. Dixon's rights." (Opp. at 24.) The Second Amended Complaint cites the Report's findings regarding, *inter alia,* a pattern of unreasonable use of force by the police. (2AC ¶¶ 131–39)

I will permit the "custom" claim to go forward based on this limited showing,[10] recognizing that much of the relevant information would be in the

---

[9]   Actually, the date of December 2009 refers to the jury finding; the presumably earlier date of the shooting is unclear from the complaint. (2AC ¶ 144.)

[10]   It is plausibly alleged that the NPD has used constitutionally excessive levels of force at various times and in various contexts in the past. The issue is not, however,

hands of the City. The motion to dismiss Count III, insofar as it asserts a *Monell* "custom" theory, is therefore DENIED.

### 3. Failure to train, supervise, or discipline (Count IV)

Next, the plaintiff alleges that the City defendants should be liable for failure to train, supervise, or discipline Crespo or the other officers involved. I find that plaintiff has failed to state a *Monell* claim regarding training, but has stated a claim of failure to discipline Crespo.

The complaint alleges generally that the City "was aware of a need for more and different training" and that it "failed to properly train or modify its training." (2AC ¶ 221, 223.) NPD officers are required to undertake bi-annual use of force and vehicular pursuit trainings. (DE 26-2 at 7, 10) The complaint acknowledges that such training was required by the consent decree (*id.* ¶ 224–25); it does not, however, allege that mandated training was not implemented

---

whether the NPD *ever* was under the direction of an administration that condoned excessive use of force, but whether it remained in that status at the time of Dixon's arrest in January 2019.

The DOJ Report arguably assists in bridging the gap between the two sets of specific incidents, dating from 2008–09 and 2020–21. The 2014 DOJ Report was based on an investigation that began in 2011. (2AC ¶ 132.) In 2016, the City and the DOJ entered into a consent decree that was intended to remedy the unconstitutional practices described in the Report. (2AC ¶ 131.) The Report and consent decree have been successfully cited by plaintiffs in *Monell* cases to establish a custom of unconstitutional practices by the NPD. *See Fallen*, 2017 WL 368500 (2012); *Kelly*, 2018 WL 1378727 (2015). In those cases, however, the alleged unconstitutional acts occurred in roughly the same time frame covered by the Report and decree. *See also Roman*, 914 F.3d at 799 ("While the consent decree was not in place during Roman's search and arrest, we may fairly infer that the problems that led to it were occurring during the time of his allegations and for some time before that.").

At the time of the events now in suit, it had been more than four years since the DOJ report, and the consent decree had been in effect for two years. The NPD was then, and remains today, under the supervision of a federal monitor, who has also promulgated new formal policies governing police procedures. (2AC ¶ 149; *see also* https://www.newarkpdmonitor.com (official website of NPD Independent Monitor, last visited Dec. 21, 2021).) Now it is possible, of course, that a pattern of unconstitutional customs and practices had abated by the time of Dixon's arrest; it is also possible that municipal compliance had lagged. Plaintiff alleges that the pattern has persisted, a claim that may be tested in discovery.

13

or that the training was insufficient in some respect. The only allegation of substandard training that approaches the factual is a quote from Officer Crespo in a television interview that "we didn't receive any training that can help me with that incident." (2AC ¶ 127) Given the training that was admittedly in place, that vague and self-serving statement is not enough to establish that the City was deliberately indifferent to training NPD officers and that such a lack of training caused the shooting of Mr. Dixon. It is, of course, possible that the NPD's training regimen is in some way insufficient, or that the officers did not attend. The complaint, however, does not specifically allege as much. It therefore does not state a failure-to-train *Monell* claim with respect to the officers involved.

Plaintiff has stated a plausible claim, however, regarding the City defendants' failure to discipline Crespo. Such a pointed claim is different from a claim of systemic failure, like the ones above, which a plaintiff should be able to allege if it is true. Here, the complaint alleges that the City made a deliberate choice not to discipline Crespo despite "repeated unconstitutional, unlawful, or other improper conduct," specifically, "a pattern of complaints regarding excessive force." (2AC ¶ 213–214.) The complaint provides no more details about complaints against Crespo, but at this stage that is not surprising, because discovery has not yet commenced, and relevant records are in the hands of the City. *See Harvey v. Cty. of Hudson*, 2015 WL 9687862, at *10 (D.N.J. Nov. 25, 2015). The link between failure to discipline (even if prior complaints were not similar in every factual detail) and a sense of individual impunity, contributing to the excessive use of force, would be a plausible one. Taking the allegation that Crespo was not disciplined after a pattern of complaints as true, as I do at this stage, I find that plaintiff has stated a plausible *Monell* claim for failure to discipline Crespo. As to the other officers, however, the failure to discipline claim lacks factual support.

The motion to dismiss Count IV is DENIED as to the claim of failure to discipline Crespo, but otherwise GRANTED.

### 4. Negligent Hiring (Count IX)

Finally, plaintiff alleges that the City defendants negligently hired and retained the defendant officers. The Supreme Court has established a high standard for stating a negligent-hiring *Monell* claim. A finding of culpability for negligent hiring "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 412 (1997). The plaintiff makes no allegations whatever about the pre-hiring backgrounds of any of the officers involved, let alone the manner in which their backgrounds would be connected to the shooting of Mr. Dixon. Nor does he plead facts related to the NPD's hiring policies generally. The complaint's brief recitation of the elements of respondeat superior (2AC ¶ 262–67), to the extent it is relevant at all, *see* p. 5, *supra*, is not sufficient to state a claim.

The motion to dismiss is therefore GRANTED with regard to Count IX.

### III. MOTION FOR STAY

The City defendants request that this case be stayed pending the resolution of the criminal proceedings against Officer Crespo.[11] (Mot. at 32.) In considering whether to issue a stay, I must consider a number of issues including "1) the extent to which the issues in the criminal and civil cases overlap; 2) the status of the case, including whether the defendants have been indicted; 3) the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay; 4) the private interests of and burden on defendants; 5) the interests of the court; and 6) the public interest." *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 527 (D.N.J. 1998). I take each of the factors in turn.

---

[11] *State of New Jersey v. Jovanny Crespo*, ESX-19-004022, New Jersey Superior Court, Essex County. The City also refers to disciplinary proceedings against Crespo. As to these, the case for a stay is much weaker, so I focus on the criminal case.

First, there is no doubt that this matter and the criminal case both center on Officer Crespo's actions and thus that there is significant, if not total, overlap of the issues. Second, Officer Crespo has been indicted, so there is a real risk of self-incrimination in defending against these civil allegations, a factor which weighs in favor of the stay. Third, given the disruption of criminal cases due to COVID-19, the pre-pandemic assumption that a criminal case would be speedily disposed of, and therefore would cause little prejudice to the civil plaintiff, has lost some of its validity. Of course, civil trials have been delayed as well, possibly mitigating the prejudice of one vis-à-vis the other. *Id.* That said, there is a risk of prejudice to the plaintiff if the resolution of Crespo's criminal case is delayed for a long time. This factor therefore weighs somewhat against a stay. Fourth, as noted, this case risks burdening defendant Crespo's privilege against self-incrimination. No similar burden has been identified in relation to the other defendants, who have not been criminally charged. This factor therefore weighs in favor of a stay, but only partially. Finally, the interests of this Court and the public interest are largely neutral.

Given that there are factors pulling in both directions, and a certain amount of COVID-related uncertainty, I find that the best course of action is to deny the request for an outright stay. I will allow discovery to proceed on all issues except for those directly connected to the criminal case against Crespo. Any deposition of Crespo himself or discovery of privileged matter will of course be stayed. Nevertheless, there are undoubtedly many documents that can be produced and depositions that can be taken without burdening Officer Crespo's right against self-incrimination. Issues as to whether particular items or proceedings should be subject to the stay can be handled individually, without a formal invocation of the privilege, to avoid any adverse inference. If at some point an impasse is reached, a renewed motion for a stay may be appropriate. Ideally, the criminal case will be completed within a reasonable amount of time; in the interim, however, there is a real value in making whatever progress can be made in this civil case, under the able supervision of the Magistrate Judge.

**IV.   CONCLUSION**

For the reasons set forth above, the City defendants' motion to dismiss (DE 26) is GRANTED in part and DENIED in part. Specifically, the motion to dismiss is granted with regard to all claims against Mayor Ras J. Baraka in his personal capacity. The motion to dismiss is granted with regard to Count III (policy), but denied as to Count III (custom). The motion is denied as to Count IV (failure to discipline Officer Crespo), but otherwise granted as to the remainder of Count IV. Finally, the motion to dismiss is granted as to Count IX.

Defendants' request to stay this case is DENIED as presented, with the proviso that discovery shall proceed with respect to issues that do not implicate Officer Crespo's right against self-incrimination. A separate order will issue.

Dated: December 22, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**